UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANCE FOR PROPERTY RIGHTS AND FISCAL RESPONSIBILITY; BRYON REED; CARL AND LINDA TAYLOR, husband and wife; HAROLD AND RITA CARLSON, husband and wife; JEFF AND JACKIE WALBOM, husband and wife, TED AND CAROL WHITEHEAD, husband and wife; ROBERT JOHNSON; JIM AND PENNY DIXON, husband and wife; PAMELA LYON; WAYNE AND ANN JENSEN, husband and wife; and ELMER AND SANDRA CHERRY, husband and wife, | Case No. 4:12-cv-146-BLW<br><br>MEMORANDUM DECISION AND ORDER |

Plaintiffs,

v.

CITY OF IDAHO FALLS, a municipal corporation, and IDAHO FALLS POWER, a department of the City of Idaho Falls,

Defendants.

**INTRODUCTION**

The Court has before it the parties' cross-motions for summary judgment (Dkts. 15, 18). The Court heard oral argument on August 20, 2012 and took the matter under advisement. For the reasons explained below, the Court will grant summary judgment in plaintiffs' favor.

## FACTS

Idaho Falls Power, which is a department of the City of Idaho Falls, plans to enhance its capacity to transmit electric power.  Under this plan – known as the "Idaho Falls Power North Loop Project" – the City plans to build new transmission facilities north of the city and install new transmission lines on the east and west sides of the city. The planned route for the North Loop Project runs, in part, outside Idaho Falls' city limit and across properties owned by plaintiffs.  Idaho Falls tried to purchase easements from the plaintiffs.  The plaintiffs refused and contend that Idaho Falls has no authority to condemn property outside its city limits.  This litigation ensued.

## THE LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes – does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to

interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed. R. Civ. P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

## ANALYSIS

"Idaho has long recognized the proposition that a municipal corporation, as a creature of the state, possesses and exercises only those powers either expressly or impliedly granted to it." *Caesar v. State,* 610 P.2d 517, 520 (Idaho 1980). In keeping with this general proposition, municipalities cannot condemn lands outside their corporate limits unless the state legislature has delegated that power. *See generally* 11 McQuillin, *Municipal Corporations* § 32:15 (3d ed. 2012). Further, if the legislature has not expressly granted such powers to the municipality, any implied grant must be "clear and unmistakable." *Id.* Stated differently, if there is a "fair, reasonable, substantial doubt as to the existence of a power, the doubt must be resolved against the city." *City of Grangeville v. Haskin,* 777 P.2d 1208, 1211 (Idaho 1989) (citation omitted).

The City generally contends that three different parts of the Idaho code expressly or implicitly grant cities the right to condemn property outside their geographic limits: (1) the eminent domain statutes; (2) the Revenue Bond Act; and (3) various other statutes generally relating to a city's authority to own and operate electric power plants. The Court is unpersuaded.

**1.      General Eminent Domain Legislation – Idaho Code § 7-701 et seq.**

Beginning with general eminent domain legislation, Idaho Code § 7-720 provides that municipalities may, at their option, "exercise the right of eminent domain under the provisions of this chapter for any of the uses and purposes mentioned in section 7-701, Idaho Code." Electric power distribution is one of the public uses defined in § 7-701. *See* Idaho Code § 7-701(11).[1] Additionally, Idaho Code § 7-703(1) indicates that the "private property which may be taken under this chapter includes, among other things:

>  1.   All real property belonging to any person [and]
>
>  2.   Lands belonging to the government of the United States, to this state, or to any county, incorporated city, or city and county, village or town, not appropriated to some public use."

Idaho Code § 7-703(1), (2).

The City emphatically argues that these statutes expressly authorize cities to condemn property outside their geographic limits. But none of the statutes say that. They are silent on that point. So, based on the general rule that cities do not have

---

[1] Idaho Code § 7-701(11) defines public use to include "electric distribution and transmission lines for the delivery, furnishing, distribution, and transmission of electric current for power, lighting, heating or other purposes; and structures, facilities and equipment for the production, generation, and manufacture of electric current for power, lighting, heating or other purposes."

extraterritorial takings power, sub-paragraph 1 of § 7-703, in referring to "any" property, means that the City of Idaho Falls can take "any" property within its geographic limits.

Sub-paragraph 2 of § 7-703 is arguably more troublesome for the plaintiffs, because if the takings power extends to lands "belonging to" the state, other cities, etc., one might logically assume that these lands would be outside the city limits.  But plaintiffs convincingly argue that sub-paragraph 2 can also be read as providing that cities can condemn other governmental entities' properties if that property is within city limits.  *See Plaintiff's Reply & Opp.*, Dkt. 23, at 5 (citing *Georgia v. City of Chattanooga*, 264 U.S. 472, 479-81 (1924)); *cf. Board of Township Trustees v. Lambrix*, 396 N.E. 2d 1056 (Ohio Ct. App. 1978) (township had no statutory authority to appropriate land inside the limits of a village located wholly within the township).

Further, a 1989 guideline from the Idaho's Attorney General Office generally supports plaintiffs' view of the general eminent domain legislation.  *See Apr. 12, 1989 Letter from Idaho Attorney General's Office,* Dkt. 15-2.  The Attorney General opined that Idaho's eminent domain statutes do not expressly or implicitly authorize cities to condemn property outside their limits.  *Id.* at 3-4.  The guideline also identifies "innumerable" practical problems that would result from implying extraterritorial takings authority to cities:

> For example, if the City of Kellogg could condemn the airspace over the City of Wardner under Idaho Code §§ 7-701 and 7-720, then the statutes would also grant the city power to condemn property in Wardner for a public park.  The same statutory authority relied on by the City of Kellogg would grant similar power to the City of Wardner, which could lead to a battle of condemnation suits between adjacent cities.  This clearly is not the intent of the legislature in promulgating Idaho Code §§ 7-701 et seq.

> *Rather, it is more sensible to conclude that the legislature intended the power of eminent domain be contained within the jurisdictional limits of the condemning entity.*

*Id.* (emphasis added).

The Attorney General does not discuss § 7-703, which was in place at the time. But this makes sense because § 7-703 outlines the *states'* power of eminent domain and in that context, it makes sense to talk about condemning property possessed by cities, towns and the like.  As the Attorney General explained, however, allowing cities to condemn each other's property across jurisdictional lines does not make sense, and does not appear to be what the legislature intended.

For all these reasons, the Court finds that Idaho's general eminent domain legislation (§ 7-701, § 7-703, and § 7-720) does not authorize cities to take property outside their geographic limits.  Alternatively, at a very minimum, there is a "fair, reasonable, substantial" doubt as to this question, which compels a ruling in plaintiffs' favor.

## 2.     The Revenue Bond Act – Idaho Code § 50-1027 et seq.

Likewise, Idaho's Revenue Bond Act does not authorize cities to condemn property outside their geographical boundaries. As applied to this case, the Revenue Bond Act empowers the City of Idaho Falls to:

    (a) improve or extend any "works" – which include electrical systems – inside or outside the city;

    (b) acquire lands needed "in connection therewith" by "gift or purchase"; and

    (c) exercise eminent domain rights "for any of the works, purposes or uses provided by" the Revenue Bond Act.

Idaho Code § 50-1030;[2] *see also* Idaho Code § 50-1029(a) & (h) (defining the term "works" to include "electric systems").  The City argues that the Revenue Bond Act expressly empowers cities to condemn lands outside their limits for electric power uses.  But, once again, the statute does not say that.  *Accord 1985 AG Guideline*, at 2 ("Idaho Code § 50-1030(c) addresses the uses for which the municipal power to condemn may be exercised; it does not address the issue of jurisdictional restraints on the municipality's power to condemn.").  It just says that cities may exercise the eminent domain power for electric power purposes "in like manner and to the same extent as provided in section 7-720, Idaho Code."  Idaho Code § 50-1030(c).  So the analysis ultimately circles back to § 7-720.

It is also significant that an earlier version of the Revenue Bond Act expressly provided that cities could acquire land by "gift, purchase *or the exercise of eminent domain . . . .*"  *Revenue Bond Act,* ch. 4, § 4(a), 1951 Idaho Session Laws, codified at Idaho Code § 50-2815(a) (1957) (emphasis added).  When the legislature enacted the

---

[2] The relevant parts of Idaho Code § 50-1030, provide:

In addition to the powers which it may now have, any city shall have power under and subject to the following provisions:

(a) To acquire by gift or purchase and to construct, reconstruct, improve, better or extend any works [defined elsewhere to include electric systems] within or without the city, or partially within or partially without the city, or within any part of the city, and acquire by gift or purchase lands or rights in lands or water rights in connection therewith, including easements, . . . .

(b) To rehabilitate existing electric generating facilities;

(c) To exercise the right of eminent domain for any of the works, purposes or uses provided by this act, in like manner and to the same extent as provided in section 7-720, Idaho Code . . . .

current version of the Revenue Bond Act, it said only that cities could acquire lands

outside city limits by "gift or purchase" – thereby deleting the phrase "or the exercise of

eminent domain." *See* Idaho Code § 50-1030(a). *Compare id.* (providing that cities may

"acquire by gift or purchase lands . . . .") *with* Idaho Code § 50-2815(a) (1957) (providing

that cities may "acquire by gift, purchase, *or the exercise of the right of eminent domain*,

lands . . . .") (emphasis added).

The omission of this language is telling – particularly in view of the fact that both

the prior and current versions of the statute empower cities to exercise the right of

eminent domain "in like manner and to the same extent as provided by Section 7-720,

Idaho Code." *See* Idaho Code § 50-1030(c); Idaho Code § 50-2815(b) (1957).  If, as the

City argues, this general language grants extraterritorial takings powers, the legislature

would have had no reason to include the more specific language.  So the City essentially

invites the Court to view the specific eminent domain language in the earlier statute as

mere surplusage, and, therefore, the deletion of that language as irrelevant.  The Court

declines to do so, as this violates "'a cardinal principle of statutory construction'" –

namely, that statutes be construed such that "'no clause, sentence, or word shall be

superfluous, void, or insignificant.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)

(quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  The City's argument is also

contrary to the more specific statutory construction rules at play here.  As already

explained, doubts as to whether the legislature intended to grant extraterritorial takings

power to cities should be resolved in favor of the property owners.  With these principles

in mind, the Court concludes that the legislature previously granted extraterritorial

takings powers to cities, but then stripped away those powers in 1967, when it enacted the current version of the Revenue Bond Act.[3]

The City also cites *Payette Lakes Water & Sewer Dist. v. Hays*, 653 P.2d 438 (Idaho 1982) to support its argument that the Revenue Bond Act grants extraterritorial takings power.  But *Payette Lakes* is not helpful because the condemning party in that case – a water and sewer district – had explicit statutory authority to take property "within and without the district."  *Id.* at 439 (citing Idaho Code § 42-3212(j)[4] and § 42-4104(b)).  So the key appellate issue presented was whether the sewer district wished to condemn property for an authorized public use.  *Id.*  Here, the Court must decide whether the City has eminent domain power in the first place.  *Payette Lakes* is inapposite.

Finally, regarding *Payette Lakes,* the City's insistence that the legislature has granted to cities the "same" eminent domain powers it granted to water and sewer district is contrived.  The City makes this argument by pointing out that a section of the Revenue

_____

[3] The reason for this is unclear.  The Court observes, however, that the earlier, 1951 version of the Revenue Bond Act defined works far more narrowly; "works" included just water systems, sewage collection systems, water and sewage treatment plants, and off-street parking facilities.  *See Revenue Bond Act*, ch. 4, § 3(a), 1951 Idaho Session Laws, codified at Idaho Code § 2814(a) (1957) (defining works).  The 1967 Act defined works to include water systems, drainage systems, sewer systems, recreation facilities, off-street parking facilities, airport and air navigation facilities, and electric systems.  *See* Idaho Code § 50-1029(a) (defining works).  It may be that the legislature decided against granting extraterritorial takings powers as it broadened the uses enumerated in the Revenue Bond Act.

[4] Section 42-3212(j) provides:

> For and on behalf of the district the board shall have the following powers:
>
> . . . .
>
> (j) To have and exercise the power of eminent domain in the manner provided by law for the condemnation of private property for public use to take any property necessary to the exercise of the powers herein granted, both within and without the district; . . . .

Bond Act applicable to cities – Idaho Code § 50-1030(a) – is virtually identical to a section of Idaho's Water and Sewer Districts Revenue Bond Act – Idaho Code § 42-4104.  Both of these sections provide that the authorized entity – in addition to all other powers granted in the applicable revenue bond act – is empowered to "exercise the right of eminent domain in like manner and to the same extent as provided in section 7-720, Idaho Code."  *See* Idaho Code § 50-1030(c); *id.* § 42-4104(b).

This argument, however, ignores Idaho Code § 42-3212(j), which expressly authorizes the water and sewer district to exercise eminent domain powers "*within and without the district*."  The City cannot point to any parallel, explicit authorization for a city to exercise eminent domain outside its limits.  So the grants of power are not the same.  Indeed, based on the statutes at issue in *Payette Lakes* (as well as the earlier version of the Revenue Bond Act) it appears that when the legislature wants to authorize extraterritorial takings, it does more than generally point to Idaho Code § 7-720.  So the City's argument not only fails, it actually supports the plaintiffs' position.

## 3. Necessary Implication – The Revenue Bond Act in Context

The City argues that, at a minimum, the Revenue Bond Act necessarily implies extraterritorial takings power to cities.  As the City puts it, "[i]t makes little sense that the Legislature would permit cities to construct and/or acquire extra-territorial electrical works without the ability to operate those works through the use of eminent domain, when necessary, for the public good."  *City's Memo.*, Dkt. 17, at 5.  The City also points to various other statutes to support its necessary-implication argument, including: (1) Idaho Code § 50-342, which authorizes cities to buy and sell electric power; (2) Idaho

Code § 50-342A, which authorizes cities to enter into joint electrical generation and transmission projects with other governmental entities, and (3) Idaho Code 50-1028, which requires cities to manage electrical works efficiently and provide services at the "lowest possible cost."  The City says that when all these statutes are viewed together, it necessarily has the power to take property outside its boundaries.

The problem with the City's argument is that it is just as easy to read these statutes as meaning that the legislature intended to allow cities to own and operate electric power facilities outside their boundaries, but not to have extraterritorial takings power.  Indeed, Idaho's Attorney General concluded that the "power to own property outside the city limits . . . does not necessarily imply the power to acquire that property by eminent domain under Idaho Code § 50-1030(c) [the Revenue Bond Act]."  *AG Guideline,* at 2, citing *City of Aurora v. Commerce Group Corp.*, 694 P.2d 382, 835 (Colo. Ct. App. 1984) (authority to own property outside municipal limits does not give city power to condemn property outside its boundaries); *Sterkel v. Mansfield Bd. of Ed.*, 175 N.E. 64, 67 (Ohio 1961) (school district had authority to purchase or lease property either within or without the district but had no authority to condemn property outside its territorial limit).

Further, it is useful to examine the Revenue Bond Act in the context of other, related legislation codified at the same time.[5]  The legislature codified the Revenue Bond Act on the same day it codified a number of other statutes enumerating various municipal

---

[5] The Idaho legislature undertook a comprehensive recodification and revision of all its existing laws affecting cities and villages in 1967.

"powers."  *See generally* Idaho Code § 50-301 *et seq.*  Significantly, when the legislature

granted municipalities these powers, it expressly authorized extraterritorial takings

relating to just two specific municipal functions – cemeteries and airports.  *See* Idaho

Code § 50-320 (cemeteries);[6] Idaho Code § 50-321 (airports).[7]  By contrast, the statutes

in that same series dealing with a city's electric "powers" do not authorize extraterritorial

takings. *See* Idaho Code § 50-325 (authorizing cities to acquire, own, maintain and

operate electric power plants, purchase electric power, and provide for distribution to

residents of the city, and to sell excess power . . . ."); *id.* § 50-328 (authorizing cities to

"permit, authorize, provide for and regulate the erection, maintenance and removal of

utility transmission systems . . . upon any lands owned or under the control of such city,

whether they may be within or without the city limits.").

 The fact that the legislature specifically included extraterritorial takings power for

cemeteries and airports, but did not include that power for electric power purposes,

strongly suggests that the legislature knowingly decided against allowing cities to

condemn property outside their limits for electric power purposes.

 At oral argument, the City suggested that the specific grants of extraterritorial

takings power for cemeteries and airports were likely made because cemeteries and

airports are not listed as "public uses" in Idaho Code § 7-701.  But this argument fails

---

[6] Idaho Code § 50-320 provides that all cities are empowered to "[p]urchase, hold and pay for" up to 80 acres of land, in one parcel, outside the city limit."  The statute further provides that cities may "exercise the right of eminent domain under the provisions of chapter 7 of title 7, Idaho Code, in the taking or securing of such grounds and property."

[7] The airport statute expressly states that cities are empowered to "acquire by purchase, gift, lease, sublease, *or otherwise hold and take over* such lands as the city council may deem necessary *within or without the corporate limits* . . . ."  Idaho Code § 50-321 (emphasis added).

because even though airports are not an enumerated "public use," cemeteries are. *See* Idaho Code § 7-701(8) (providing that eminent domain may be used for various "public uses" including "[c]emeteries for the burial of the dead, and enlarging and adding to the same and the grounds thereof."). Thus, when examining the Revenue Bond Act and general eminent domain legislation in context, the legislature apparently decided against granting cities unlimited power to condemn property outside their geographic limits.

*Bradbury v. Idaho Falls,* 177 P. 388 (Idaho 1918) supports this conclusion. In *Bradbury*, the City of Idaho Falls wished to expand its light and power plant – just as it now does. The issue in that case was whether the city could issue bonds to expand its light and power plant. The bond statute allowed the city to issue bonds to *acquire* light and powers plants, but it did not expressly authorize the city to issue bonds to *expand* light and power plants. *See id*. at 389. By contrast, a companion statute relating to waterworks expressly authorized the city to issue bonds to acquire *and enlarge* waterworks plants. By comparing these two statutes, the court concluded that if the legislature had intended to empower cities to issue bonds to *enlarge* power plants, it "would have made that intention as clear and unmistakable in the one instance as it did in the other." *Id.* at 390.

A final statute that bears on this analysis is Idaho Code § 50-220. This section – which was codified simultaneously with the Revenue Bond Act, as well as the airport and aviation statutes – authorizes cities "to acquire by purchase, lease *or otherwise*, lands outside of their respective corporate limits and to own, control, regulate and administer lands so acquired, . . . ." (emphasis added). The City argues that the phrase "*or*

*otherwise*" means that cities are empowered to condemn property outside city limits.  But if that were the intended meaning, the legislature would have had no reason to expressly grant extraterritorial takings powers in other statutes enacted at the same time.  *See* Idaho Code §§ 50-320 & 50-321.

Additionally, in construing these types of disputes, the Court must resolve fair, reasonable, substantial doubts against the City.  As plaintiffs have pointed out, the "or otherwise" phrase could easily be construed to mean some other type of land acquisition – not condemnation.  At least one other court reached the same conclusion when confronted with similar statutory language.  In *Kenneth Mebane Ranches v. Superior Court*, 12 Cal. Rptr. 2d 562 (Cal. Ct. App. 1992), the California Court of Appeals held that a statutory grant of power "'[t]o take by grant . . . *or otherwise* . . . real or personal property . . . within or without the district necessary to or convenient for the full exercise of its powers'" was not an express grant of extraterritorial takings power.  *Id.* at 566.  The court noted that because the statute at issue listed "a number of voluntary methods by which the District" could take property outside its boundaries, the "'or otherwise' provision can only be construed to refer to another voluntary method of acquisition."  *Id.*  The same is true here.

In sum, the City of Idaho Falls lacks authority to condemn property outside its limits for electric power purposes.  The Court will therefore grant summary judgment in plaintiffs' favor.[8]

---

[8] With this ruling, the Court need not address plaintiffs' remaining arguments.

## ORDER

1.  Plaintiffs' motion for summary judgment (Dkt. 15) is **GRANTED**.

2.  Defendants' cross-motion for summary judgment (Dkt. 18) is **DENIED**.

DATED: September 7, 2012

B. Lynn Winmill
Chief Judge
United States District Court